OPINION BY
PRESIDENT JUDGE LEAVITT
FirstEnergy Corporation and West Penn Power[1] (collectively, West Penn) appeal an order of the Washington County Court of Common Pleas (trial court) overruling their preliminary objections to a complaint filed by Sunrise Energy, LLC (Sunrise Energy). Sunrise Energy, inter alia, seeks declaratory relief and damages for breach of contract. West Penn filed a motion to dismiss asserting that the matter should be transferred to the Pennsylvania Public Utility Commission (PUC) because the dispute requires the construction of the Alternative Energy Portfolio Standards Act (Alternative Energy Act).[2] The trial court concluded, however, that a court of common pleas was competent to construe the terms of the Alternative Energy Act. Because the legislature did not authorize the PUC, or any other state agency with responsibilities in the area of alternative energy, to adjudicate a dispute arising from the Alternative Energy Act, we affirm the order of the trial court.
Background
Sunrise Energy operates a 950 kilowatt solar power facility in Washington County, Pennsylvania; West Penn is an electric distribution company.[3] Amended Complaint, ¶ 8. On October 21, 2010, Sunrise Energy and West Penn entered into an “Electric Service Agreement” that designated Sunrise Energy as the “customer.” *897 Amended Complaint, Exhibit 2; Reproduced Record (R.R_) at 27a-29a. In accordance with this contract, West Penn agreed to purchase the excess electricity generated by Sunrise Energy. Amended Complaint, Exhibit 6; R.R. 40a. Sunrise Energy measures the electricity it generates and the electricity it consumes through the use of a bidirectional electricity meter. This measurement is known as “net metering.”
As a condition to its agreement to purchase electricity from Sunrise Energy, West Penn required Sunrise Energy to pay for certain infrastructure improvements. Sunrise Energy did so in two payments: the first payment was in the amount of $29,804.40 and the second was in the amount of $39,147.66. Amended Complaint, ¶ 30. Both parties to the Electric Service Agreement believed that Sunrise Energy was á customer-generator within the meaning of the Alternative Energy Act and, as such, eligible to sell the electricity it generated in excess of what it consumed. Amended Complaint, ¶ 97 and Exhibit 2; R.R. 27a-32a.
On May 22, 2014, West Penn terminated its Electric Service Agreement with Sunrise Energy for the stated reason that Sunrise Energy did not qualify for net metering. Amended Complaint, ¶ 38. Stated otherwise, Sunrise Energy lacked a sufficient “native retail load.” Amended Complaint, ¶ 41. West Penn asserted that Sunrise Energy was not a consumer-generator but, in actuality, an electric generation supplier.[4] West Penn notified Sunrise Energy that it intended to compensate Sunrise Energy at a rate other than that set forth in its Net Energy Metering Rider and to recover its prior overpayments. Amended Complaint, ¶ 43.
On February 20, 2014, two months before West Penn terminated its Electric Service Agreement with Sunrise Energy, the PUC published a proposed amendment to its net metering regulation in the Pennsylvania Bulletin; The amendment proposed to require customer-generators to maintain “an independent retail load” in addition to meeting the other requirements for customer-generators set forth in the Alternative Energy Act. The PUC ex *898 plained its proposed amendment as follows:
Currently, Section 75.13(a) requires EDCs [Electric Distribution Companies] to offer net metering to customer-generators and provides that EGSs [Electric Generation Suppliers] may offer net metering to customer-generators under the terms and conditions set forth in agreements between the EGS and the customer-generator taking service from the EGS. The current regulation is silent as to which customer-generators can net meter, other than that they must be using Tier I or Tier II alternative energy sources.
We have added a provision for DSPs [Default Service Provider] and have moved the EGS net metering role to subsection 75.13(b) and re-lettered the remaining subsections. In our proposed new section (a), we require EDCs and DSPs to offer net metering to customer-generators that generate electricity on the customer-generator’s side of the meter using Tier I or Tier II alternative energy sources, on a first come, first served basis, provided they meet certain conditions.
The first condition requires the customer-generator to have load, independent of the alternative energy system, behind the meter and point of interconnection of the alternative energy system. To be independent, the electric load must have a purpose other than to support the operation, maintenance or administration of the alternative energy system. This provision makes explicit what was previously implied in the [Alternative Energy] Act and the regulations.
This requirement is implied in the [Alternative Energy] Act definition of net metering where it states that net metering is the means of measuring the difference between the electricity supplied by an electric utility and the electricity generated by the customer-generator when any portion of the electricity generated by the alternative energy generating system is used to offset part or all of the customer-generator’s requirements for electricity. If there is no independent load behind the meter and point of interconnection for the alternative energy system, by definition, the customer-generator has no requirement for electricity to offset. In addition, this requirement is implied in the current regulations, where it states that EDCs shall offer net metering to customer-generators that generate electricity on the customer-generator’s side of the meter. Again, there would be no need for a customer’s electric meter if there was no independent demand for electricity. Furthermore, we note that both alternative and traditional electric generation facilities require electric service to start, operate and maintain those facilities. Thus, to preclude utilities, such as merchant generators, from qualifying for net metering, we require load independent of the generation facility. To do otherwise would be contrary to the definition of a customer-generator that only includes nonutility owners and operators of alternative energy systems.
44 Pa. B. 4181-4182 (2014) (emphasis added); R.R. 71a-72a. On May 19, 2016, the Independent Regulatory Review Commission disapproved the PUC’s proposed regulation for the stated reason that it exceeded the PUC’s authority under the Alternative Energy Act.[5] 46 Pa. B. 2919 (2016).
*899 On August 20, 2014, Sunrise Energy-initiated an action against West Penn for refusing to pay for the. electricity it received from Sunrise Energy and for terminating the Electric Service Agreement one year before the expiration of the five-year term ■ of the agreement. In its amended complaint, Sunrise Energy asserted the following five counts: Declaratory Judgment (Count I), Breach of Contract (Count II), Quasi-Contract (Count III), Promissory Estoppel (Count IV), and Direct Cause of Action for Alternative Energy Act Violations (Count V). Sunrise Energy sought monetary damages for West Penn’s breach of contract or, if the contract was void or voidable, equitable relief because West Penn induced Sunrise Energy to pay for West Penn’s infrastructure improvements and because West Penn was being unjustly enriched. It was using Sunrise Energy’s excess electricity but not paying for it.
On December 15, 2014, West Penn filed preliminary objections asserting that jurisdiction over the subject matter of the amended complaint rested exclusively with the PUC. The trial court disagreed because the controversy did not arise from, nor was it governed by, the Public Utility Code. The trial court reasoned as follows:
Under the Public Utility Code, [66 Pa. C.S. §§ 101-3316,] the:PUC is vested with supervisory and regulatory power over all public utilities doing business in the Commonwealth, 66 Pa. C.S. § 501(b). While [the trial court] acknowl■edges that “initial jurisdiction over matters involving the reasonableness, adequacy or sufficiency of a public utility’s service, facilities or rates is vested in the PUC,” the controversy before the court is not of that kind; it is whether West Penn’s net metering termination, and refusal to pay Sunrise [Energy] net metering proceeds, violates [the Alternative Energy Act]. Resolution of this question depends on, and appears to be wholly dependent on, whether Sunrise [Energy] is a customer-generator, as defined under the [Alternative Energy] Act.
Trial Court op. at 5 (citations and footnote omitted and emphasis in original); R.R. 250a. The trial court concluded that it was competent to decide whether Sunrise Energy was a customer-generator within the meaning of the Alternative Energy Act and overruled West Penn’s preliminary objections. West Penn appealed to this Court.[6]
Issues
On appeal,[7] West Penn contends that the trial court erred. Specifically, it argues that the PUC is vested with exclusive jurisdiction over Count I, which seeks a declaratory judgment that Sunrise Energy ⅛ a customer-generator within the meaning of the Alternative Energy Act. Alternatively, West Penn argues that the PUC has primary jurisdiction over the remaining Counts, which means that the trial *900 court should refer the statutory construction question to the PUC ■ and hold the matter in abeyance until the PUC issues its ruling. The PUC has filed an amicus curiae brief in support of West Penn’s position.
The Alternative Energy Portfolio Standards Act
Although Pennsylvania is rich in natural gas, coal and oil resources, our General Assembly has made the policy decision to promote the development of alternative energy sources, such as solar, solar thermal, hydropower and geothermal reserves. See Section 2 of the Alternative Energy Act, 73 P.S. § 1648.2 (listing sources for the production of electricity that constitute “alternative energy sources”).[8] To that end, Section 3(a)(1) of the Alternative Energy Act mandates that
electric energy sold by an electric distribution company or electric generation supplier to retail electric customers in this Commonwealth shall be comprised of electricity generated from alternative energy sources and in the percentage amounts as described under subsections (b) and (c).
73 P.S. § 1648.3(a)(1) (emphasis added).
To kick-start the development of alternative energy in Pennsylvania, the legislature tasked the PUC to “establish an alternative energy credits program as needed to implement this act.”[9] Section 3(e)(1) of the Alternative Energy Act, 73 P.S. § 1648.3(e)(1). The legislature also tasked the PUC “to develop technical and net metering interconnection rules for customer-generators _” Section 5 of the Alternative Energy Act, 73 P.S. § 1648.5.[10] Finally, the legislature tasked the Department of Environmental Protection to establish, in cooperation with the Department of Labor and Industry, “reasonable health and safety standards” for alternative energy facilities. Section 6 of the Alternative Energy Act, 73 P.S. § 1648.6.
Section 2 of the Alternative Energy Act defines a customer-generator as:
A nonutility owner or operator of a net metered distributed generation system with a nameplate capacity of not greater than 50 kilowatts if installed at a residential service or not larger than 3,000 kilowatts at other customer service locations, except for customers whose systems are above three megawatts and ■up to five megawatts who make their systems available to operate in parallel with the electric utility during grid emergencies as defined by the regional transmission organization or where a mi-crogrid is in place for the primary or secondary purpose of maintaining critical infrastructure, such as homeland security assignments, emergency services facilities, hospitals, traffic signals, waste-water treatment plants or telecommunications facilities, provided that technical rules for operating generators interconnected with facilities of an electric distri- *901 button company, electric cooperative or municipal electric system have been promulgated by the Institute of Electrical and Electronic Engineers and the Pennsylvania Public Utility Commission.
73 P.S. § 1648.2(emphasis added). Section 5 of the Alternative Energy Act requires utilities to purchase the electricity generated by a customer-generator at the full retail price. It states in full:
Excess generation from net-metered customer-generators shall receive full retail value for all energy produced on an annual basis. The [PUC] shall develop technical and net metering interconnection rules for customer-generators intending to operate renewable onsite generators in parallel with the electric utility grid, consistent with rules defined in other states within the service region of the regional transmission organization that manages the transmission system in any part of this Commonwealth. The [PUC] shall convene, a stakeholder process to develop Statewide technical and net metering rules for customer-generators. The [PUC] shall develop these rules within nine months of the effective date of this act.
73 P.S. § 1648.5 (emphasis added). The PUC has promulgated a regulation on “technical and net metering interconnection rules” for customer-generators that “operate renewable onsite generators” that is set forth in Title 52 of the Pennsylvania Code, Chapter 75, Subchapter B “Net Metering.” See 52 Pa. Code §§ 75.11-75.15. The regulation states, in relevant part, as follows:
(a) EDCs [Electric Distribution Companies] shall,offer net.metering to customr er-generators that generate electricity on the customer-generator’s side of the meter, using Tier I or Tier II alternative energy sources, on a first come, first served basis. EGSs [Electric Generation Suppliers], may offer net metering to customer-generators, on a first come, first served basis, under the terms and conditions as are set forth in agreements between EGSs and customer-generators taking service from EGSs.
52 Pa. Code § 75.13(a).[11]
Absent from the Alternative Energy Act is an enforcement provision. The legislature did not create a statutory remedy, for example, for the customer-generator who is rebuffed by an EDC or EGS. The legislature did not authorize the PUC to impose sanctions upon utilities that refuse to comply with the terms of the statute. The Alternative Energy Act authorizes the PUC to establish “technical and net metering interconnection rules,” but it does not give the PUC power to act beyond this narrow authorization. See Section 5 of the Alternative Energy Act, 73 P.S. § 1648.5. The statute does not authorize the PUC to conduct hearings to resolve disputes between two private parties engaged in a net metering arrangement. It is silent on these matters.
Definition of Customer-Generator
The amended complaint asserts that Sunrise Energy conforms precisely to the statutory definition of customer-generator set forth in Section 2 of the Alternative Energy Act. 73 P.S. § 1648.2.[12] Sunrise *902 Energy’s “net metered distributed generation system” has “a nameplate capacity ... not larger than 3,000 kilowatts.” Amended Complaint, ¶ 15. Sunrise Energy observes that the only statutory limitation upon a non-residential service consumer seeking to qualify as a “customer-generator” is upon its capacity to generate electricity. Id.
West Penn responds that Sunrise Energy has taken the word “net” out of “net metering.” It argues that unless a customer-generator purchases electricity for purposes beyond what is needed to generate alternative electricity, it is not a true customer-generator under the Alternative Energy Act. To this, Sunrise Energy responds that West Penn’s legal argument depends upon facts not pled in the amended complaint. It also responds that West Penn’s understanding of what constitutes a true customer-generator adds language to the existing statutory definition. Section 2 of the Alternative Energy Act limits the amount of electricity a customer-generator may produce for sale, but it does not require the customer-generator to purchase a minimum amount of electricity. Likewise, the statute does not specify how the customer-generator must use the electricity that it purchases from the EDO or EGS.
We need not decide the merits of these arguments. The only question is whether these statutory construction arguments must, in the first instance, be heard by the PUC.
Jurisdiction
Our Supreme Court has instructed that where the General Assembly has
seen fit to enact a pervasive regulatory scheme and to establish a governmental agency possessing expertise and broad regulatory and remedial powers to administer that statutory scheme, a court should be reluctant to interfere in those matters and disputes which were intended by the Legislature to be considered, at least initially, by the administrative agency. Full utilization of the expertise derived from the development of various administrative bodies would be frustrated by indiscriminate judicial intrusions into matters within the various agencies’ respective domains.
Feingold v. Bell of Pennsylvania, 477 Pa. 1, 383 A.2d 791, 793 (1977). Our Supreme Court also noted that “[a]s with all legal rules,” this one is not inflexible. Id. A court may exercise jurisdiction where the administrative remedy is not adequate. Id. “The mere existence of a remedy does not dispose of the question of its adequacy; the administrative remedy must be ‘adequate and complete.’ ” Id. at 794 (citation omitted). Where a statutory procedure would be of “little, if any, utility,” it may be bypassed. Borough of Green Tree v. Board of Property Assessments, 459 Pa. 268, 328 A.2d 819, 825 (1974). Accordingly, a challenge to the constitutionality of a taxing statute may be initiated in equity, notwithstanding the statutory remedy for challenging a tax assessment. Id. This is because where the validity of the statute is concerned, “less need exists for the agency involved to throw light on the issue through exercise of its specialized fact-finding function or application of its administrative expertise.” Id.
In Feingold, the Supreme Court considered the question of whether a civil action *903 seeking breach of contract damages and equitable relief could proceed in a court of common pleas or, rather, should be heard by the PUC. In considering this question, the Supreme Court explained as follows:
It is relevant to the case now before us that the statutory array of PUC remedial and enforcement powers does not include the power to award damages to a private litigant for breach of contract by a public utility. Nor can we find an express grant of power from which the power to award such damages can be fairly implied. Thus, it can be concluded that the Legislature did not intend for the PUC to have such a power.
Feingold, 383 A.2d at 794. The Supreme Court noted that had the plaintiff “sought only equitable relief, in the form of an injunction, the lower court’s dismissal would have found more support in prior ease law.” Id. at 795, n.5.
In sum, an administrative agency has exclusive jurisdiction where the legislature has given it the power to adjudicate on a particular subject matter. Stated otherwise, a statutory remedy “must be strictly pursued and such remedy is exclusive” ... “unless the jurisdiction of the courts is preserved thereby.” Lashe v. Northern York County School District, 52 Pa. Cmwlth. 541, 417 A.2d 260, 263-64 (1980). The doctrine of exclusive jurisdiction requires that
[i]n all cases where a remedy is provided, or duty enjoined, or anything directed to be done by an act or acts of assembly of this commonwealth, [t]he directions of the said acts shall be strictly pursued.
Borough of Green Tree, 328 A.2d at 823. Where a court concludes that an agency has exclusive jurisdiction, it will dismiss the action.
Sometimes a statutory remedy does not involve a state or local agency but, rather, a court; sometimes the 'statutory remedy is not exclusive. See, e.g., Hoover v. Bucks County Tax Claim Bureau, 44 Pa.Cmwlth. 529, 405 A.2d 562 (1979) (holding that the statutory procedure for challenging the adequacy of a tax sale notice before a court of common pleas is not exclusive of an equitable remedy). More typically, however, the statutory remedy does involve an administrative agency, as in Feingold. Where a court concludes that it has “concurrent statutory jurisdiction over a dispute but that an issue ... is within the primary jurisdiction of an agency, the court will defer any decision in' the dispute ... until the agency has addressed the issue that is within its primary jurisdiction.” 2 Richard J. Pierce, Jr., Administeative Law TReatise § 14.1 at 1161 (5th ed. 2010)' (emphasis added). The doctrine of primary jurisdiction is comparable to exhaustion of administrative remedies; both doctrines allocate adjudicatory responsibility between courts and agencies. Id. at 1162. In Pettko v. Pennsylvania American Water Co., 39 A.3d 473, 479 (Pa. Cmwlth. 2012), we explained as follows:
[T]he doctrine of primary jurisdiction permits the bifurcation of a plaintiffs claim, whereby a trial court, faced with a claim requiring the resolution of an issue that is within the expertise of an administrative agency, will first cede the analysis of the issue or issues to that agency. Once the agency resolves the particular issue or issues over which it has primary jurisdiction, the trial court may proceed, if necessary, to apply the agency’s decision to the dispute remaining before the trial court.

Id.

Whether a matter lies within the exclusive jurisdiction or the primary jurisdiction of an agency is for the legislature *904 to direct by statute. Borough of Green Tree, 328 A.2d at 823. The overarching principle of either doctrine is deference to the will of the legislature in its establishment of a statutory remedy.
I.
West Penn contends that the PUC has exclusive jurisdiction over the question of whether Sunrise Energy is a customer-generator within the meaning of the Alternative Energy Act. The trial court held that statutory construction is a matter for the courts. Further, unlike the pervasive regulatory scheme set up in the Public Utility Code, 66 Pa. C.S. §§ 101-3316, the Alternative Energy Act confers no authority upon the PUC to adjudicate matters arising under the Alternative Energy. Act. We agree with the trial court.
Even where a statute provides a remedy for its enforcement, as the Public Utility Code does on matters relating to the reasonableness of a utility’s service and rates, Feingold teaches that the statutory remedy must be adequate and complete. In Feingold, the statutory remedy in the Public Utility Code was held not to be adequate because the plaintiff sought damages for breach of contract, and contract damages cannot be awarded by an administrative agency. Feingold, 383 A.2d at 794. Nol-is the statutory remedy adequate where the constitutionality of the governing statute is the issue. Borough of Green Tree, 328 A.2d at 825.
Here, there is no statutory remedy in the Alternative Energy Act whose “adequacy” is in doubt and, accordingly, this is not a close case. The Alternative Energy Act does not vest the PUC with “an array of [] remedial and enforcement powers.” Feingold, 383 A.2d at 794. The PUC does not have the power to adjudicate the subject matter of the amended complaint, i.e,, whether Sunrise Energy meets the statutory definition of “customer-generator.” Accordingly, we reject West Penn’s claim that the PUC has exclusive jurisdiction to decide the merits of Count I of the amended complaint. Simply, there is no statutory remedy provided in the Alternative Energy Act for resolving disputes arising thereunder. The trial court correctly rejected West Penn’s contention that the PUC has exclusive jurisdiction to decide whether Sunrise Energy is a customer-generator as defined in Section 2 of the Alternative Energy Act.
II.
Alternatively, West Penn argues that the PUC has primary jurisdiction over the remaining Counts in the amended complaint. It argues that the trial court should allow the PUC, in the first instance, to decide the statutory construction question. After it does so, the trial court may then, if necessary, conduct a hearing on Sunrise Energy’s breach of contract and quasi-contract claims.[13] The PUC, which has filed an amicus curiae biief, contends that allowing a court of common pleas to construe the meaning of “customer-generator” will lead to different results in different counties and thereby balkanize the electric service industry in Pennsylvania. In support of the argument that the PUC should decide whether Sunrise Energy is a customer-generator, West Penn and the PUC direct the Court to Morrow v. Bell Telephone Company of Pennsylvania, 330 Pa.Super. 276, 479 A.2d 548 (1984).
In .Momw, a customer of Bell Telephone of Pennsylvania filed a civil action in *905 a court of common pleas alleging that it was being overcharged for certain services, such as fees for restoring suspended service. Bell Telephone filed preliminary objections, asserting that the trial court lacked subject matter jurisdiction because all of the charges challenged by the plaintiff had been approved by the PUC and set forth in Bell Telephone’s tariff.[14] Indeed, it was mandatory that Bell Telephone impose the specific charges on the plaintiff unless and until the PUC approved a new tariff.
The trial court agreed and dismissed the action. On appeal, the Superior Court affirmed. It explained:
[The customer’s] equity action was a challenge to [the telephone company’s] rates and to its service practices. Rates and practices regarding deposits are peculiarly and exclusively mthin the jurisdiction and expertise of the [PÜC]. Therefore, they must be addressed by that body. Although [the customer’s] complaint contains averments of breach of contract, these averments are but a cover disguising the real thrust of his complaint, which is to challenge the adequacy and propriety of [the telephone company’s] rates and service practices.
Morrow, 479 A.2d at 551 (footnote omitted) (emphasis added).
Morrow is inapposite. It involved a subject, ie., the utility’s schedule of approval rates, or “tariff,” on which the legislature has expressly conferred jurisdiction in the PUC. See Section 1308(b) of the Public Utility Code (establishing a statutory remedy for challenging an approved tariff or rate).[15] This is not a utility rate case.
West Penn tries to make Sunrise Energy’s action a rate case by noting that the Net Energy Metering Rider is incorporated into the Electric Service Agreement as part of West Penn’s retail electric Tariff No. 39 on file with the PUC. R.R, 167a (West Penn Brief in support of Preliminary Objections at 4, n.3). The key “billing program” term that is set forth in the Net Energy Metering Rider states as follows:
The customer-generator will receive a credit for each kilowatt-hour received by [West Penn] up to the total amount of *906 electricity delivered to the Customer during the billing period at the full retail rate, consistent with [PUC] regulations. On an annual basis, [West Penn] will compensate the customer-generator for kilowatt-hours received from the customer-generator in excess of the kilowatt hours delivered by [West Penn] to the customer-generator during the preceding year at the full retail value for all energy produced consistent with [PUC] regulations. The customer-generator is responsible for the customer charge, demand charge and other applicable charges under the applicable Rate Schedule.
R.R. 41a.[16] That this rider language is part of West Penn’s tariff does not make this a rate case.
The word “tariff’ does not appear in the Alternative Energy Act. Nevertheless, the PUC’s regulation provides that “[a]n EDC shall file a tariff with the [PUC] that provides for net metering consistent with this chapter.” 52 Pa. Code § 75.13(b). However, this so-called net metering tariff is the obverse of a true tariff. A tariff sets what the utility will collect for its service. PPL Electric Utilities Corporation v. Pennsylvania Public Utility Commission, 912 A.2d 386, 402 (Pa. Cmwlth. 2006). The net metering tariff sets forth what the utility will pay for electricity. Further, the amount that the utility will pay for the customer-generator’s excess electricity has been established by the legislature in Section 5 of the Alternative Energy Act, ie., the “full retail value.” 73 P.S. § 1648.5.
A true tariff was at issue in Morrow, ie., a schedule of the charges the utility collected in exchange for providing service. The PUC approved those charges after determining that they met the standards in the Public Utility Code. 66 Pa. C.S. § 1301 (stating that every “rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission.”) (emphasis added). To make this determination, the PUC had to bring its expertise to bear on the matter and exercise discretion.
By contrast, West Penn’s Net Energy Metering Rider, on file with the PUC, simply recites what is stated in Section 5 of the Alternative Energy Act. The PUC did not have to exercise any discretion with respect to this “tariff.” Indeed, instead of calling it a “tariff,” the PUC could have just as easily called it a “rule,” which is the term actually used by the legislature in the Alternative Energy Act.[17] Regardless, West Penn’s “tariff’ is outside the scope of this litigation, which will determine, simply, whether Sunrise Energy is a customer-generator eligible for net metering. Whatever the litigation’s outcome, it will not require a change to a single word *907 in West Penn’s tariff or its “net energy-metering rider.”
The PUC claims authority to adjudicate the meaning of “customer-generator” by reason of the General Rules of Administrative Practice and Procedure (GRAPP), which authorizes agencies to hear petitions for declaratory orders. The pertinent rule states:
§ 35.19. Petitions for declaratory orders.
Petitions for the issuance, in the discretion of an agency, of a declaratory order to terminate a controversy or remove uncertainty, shall state clearly and concisely the controversy or uncertainty which is the subject of the petition, shall cite the statutory provision or other authority involved, shall include a complete statement of the facts and grounds prompting the petition, together with a full disclosure of the interest of the petitioner.
1 Pa. Code § 35.19. The PUC argues that if it is not allowed to issue a declaratory order in this case, and in other similar cases, the electric service industry in Pennsylvania will be beset by inconsistencies. The PUC further argues that it will not be able to offer its point of view in such cases because it cannot participate as an amicus cwriae. The PUC explains that, as the putative adjudicator of disputes arising from the Alternative Energy Act, it must be neutral on the statutory construction question. ■ ■
First, an agency cannot confer authority upon itself by regulation. Any power exercised by an agency must be conferred by the legislature in express terms. Aetna Casualty and Surety Company v. Commonwealth of Pennsylvania, Insurance Department, 536 Pa. 105, 638 A.2d 194, 200 (1994) (stating that an agency can only exercise powers “conferred upon it by the Legislature in clear and unmistakable language”) (citation omitted). The petition for declaratory order authorized by GRAPP assumes an underlying statutory basis for the agency’s exercise of an adjudicatory function. The Alternative Energy Act directed the PUC to set technical net metering interconnection rules. To the extent the PUC has adjudicatory authority, it is, at most, authority to clarify the technicalities of those rules. Cf. ARIPPA v. Pennsylvania Public Utility Commission, 966 A.2d 1204 (Pa. Cmwlth. 2009). The PUC does not enjoy a roving mandate to adjudicate on the construction of the Alternative Energy Act.[18]
Second, we reject the PUC’s argument that it may not participate in a common pleas court proceeding as amicus curiae because, as an adjudicator, it must remain neutral on the meaning of customer-generator. This is disingenuous. The PUC has already gone on record as stating that it believes the Alternative Energy Act implicitly requires customer-generators to have a native retail load. 44 Pa. B. 4179 (2014); R.R. 62a-91a.
*908 The PUC argues that allowing the Court of Common Pleas of Washington County to -construe the definition of customer-generator in, the Alternative Energy Act will balkanize our electric service industry. This assumes that Pennsylvania’s courts of common pleas will be unpersuaded by the ruling from the Court of Common Pleas of Washington County. It also assumes that neither party will appeal. An appeal will establish a single ruling of statewide effect. Development in the law, whether in common law, constitutional law or statutory law, often begins with a single holding by a court with original jurisdiction. See, e.g., Mayle v. Pennsylvania Department of Highways, 479 Pa. 384, 388 A.2d 709 (1978) (abolishing sovereign immunity in a case that began with a complaint in trespass filed in Commonwealth Court’s original jurisdiction). In short, the PUC’s posited parade of horribles to follow from having a judge, commissioned pursuant to Article V of the Pennsylvania Constitution, decide the present statutory construction question is not very persuasive.
In any case, the PUC’s proffered policy arguments and bleak predictions are best addressed to the General Assembly, which has the power to amend the Alternative Energy Act to include a statutory remedy. The General Assembly may also, if it deems it appropriate, amend the definition of customer-generator. Indeed, Section 7 of the Alternative Energy Act contemplates that the PUC and the Department of Environmental Protection will file an annual report with “the chairman and minority chairman of the Environmental Resources' and Energy Committee of the Senate” and their counterparts in the House of Representatives. 73 P.S. § 1648.7(c). That report “shall include at a minimum ... [recommendations for program improvements.” Id. '
The Alternative Energy Act is not part of the Public Utility Code. The legislature has authorized the PUC to develop “technical and net metering interconnection rules.” See Section' 5 of the Alternative Energy Act, 73 P.S. § 1648.5. This limited authority does not give the PUC jurisdiction to decide eligibility for net metering.[19] Eligibility has been fully established by the legislature in the Alternative Energy Act.
Not every case that involves a public utility must be presented, first, to the PUC. Such a rule would be contrary to our Supreme Court’s directive in DeFrancesco v. Western Pennsylvania Water Company, 499 Pa. 374, 453 A.2d 595 (1982).
In DeFrancesco, two property owners brought negligence claims against a water company for not supplying water pressure sufficient to allow firefighters to put out the fire that destroyed their properties. The water- company asserted that the claim belonged-before the PUC, and the Superior Court agreed. Our Supreme Court reversed, explaining:
*909 The controversy now before us, however, is not one in which the general reasonableness, adequacy or sufficiency of a public utility’s service is drawn' into question. Resolution of appellant’s claims depended upon no rule or regulation predicated on the peculiar expertise of the PUC, no agency policy, no question of service or facilities owed the general public, and no particular standard of safety or convenience articulated by the PUC.
# * ⅜

Resolving the essential question of whether the utility failed to perform its mandated duties requires no recondite knowledge or experience and falls within the scope of the ordinary business of our courts.

Id. at 597 (footnote omitted) (emphasis added). The Supreme Court concluded that the PUC’s regulatory powers did not strip a trial court of jurisdiction simply because the common law action may involve a regulated public utility.
Whether Sunrise Energy is a customer-generator must be resolved by construing the language of the Alternative Energy Act, which expressly defines “customer-generator.” Our courts of common pleas construe statutes every day. Accordingly, we have explained that:
[Cjourts should not develop a “dependency” on “agencies whenever a controversy remotely involves some issue falling arguably within the domain of the agency’s ‘expertise,’ ” because expertise is not a talisman dissolving a court’s jurisdiction, nor should accommodation to the administrative function be an abdication of judicial responsibility.
County of Erie v. Verizon North, Inc., 879 A.2d 357, 363 (Pa. Cmwlth. 2005) (quoting Elkin v. Bell Telephone Company, 491 Pa. 123, 420 A.2d 371, 377 (1980)) (emphasis added).[20] A party to a civil action cannot compel a trial court to relinquish its jurisdiction to an administrative agency just because one litigant prefers the agency to decide the issue.
Conclusion
The trial court did not err by refusing to cede jurisdiction to the PUC. Statutory construction is a responsibility of the judiciary, not the executive branch. West Penn’s argument that the PUC has exclusive or primary jurisdiction over the Amended. Complaint lacks a foundation in the Alternative Energy Act, which does not confer enforcement powers upon any state agency. For these reasons, the order of the trial court is affirmed and the matter is remanded for. further proceedings consistent with this opinion.
ORDER
AND NOW, this 14th day of October, 2016, the order of the Washington County Court of Common Pleas dated June 1, 2015, in the above-captioned matter is AFFIRMED. Accordingly, the matter is REMANDED for further proceedings in accordance with the attached opinion.
Jurisdiction relinquished.

. West Penn Power is a wholly owned subsidiary of FirstEnergy Corporation.

. Act of November 30, 2004, P.L. 1672, 73 P.S. §§ 1648.1-1648.8.' ■ .

. Section 2 of the Alternative 'Energy Act states that the term electric distribution company "shall have the same meaning given to it in 66 Pa. C.S. Ch. 28 (relating to restructuring of electric utility industry).” 73 P.S. § 1648.2. That meaning follows:
"Electric distribution company.” The public utility providing facilities for the jurisdictional transmission and distribution of electricity to retail customers, except building or facility owners/operators that manage *897 the internal distribution system serving such building or facility and that supply electric power and other related electric power services to occupants of the building or facility.
66 Pa. C.S. § 2803.

. Section 2 of the Alternative Energy Act states that the term electric generation supplier "shall have the same meaning given to it in 66 Pa. C.S. Ch. 28 (relating to restructuring of electric utility industry)." 73 P.S. § 1648.2. That meaning follows:
"Electric generation supplier”, or "electricity supplier.” A person or corporation, including municipal corporations which choose to provide service outside their municipal limits except to the extent provided prior to the effective date of this, chapter, brokers and marketers, aggregators or any other entities, that sells to end-use customers electricity or related services utilizing the jurisdictional transmission or distribution facilities of an electric distribution company or that purchases, brokers, arranges or markets electricity or related services for sale to end-use customers utilizing the jurisdictional transmission and distribution facilities of an electric distribution company. The term excludes building, or facility owner/operators that manage the internal distribution system serving such building or facility and that supply electric power and other related power services to occupants of the building or facility. The term excludes electric cooperative corporations except as provided in 15 Pa. C.S. Ch, 74 (relating to generation choice for customers of electric cooperatives).
66 Pa. C.S. § 2803. The amended complaint does not support West Penn’s contention that Sunrise Energy is an electric generation supplier because there is no allegation that Sunrise Energy sells electricity "to end 'use customers.”

. The final regulation was originally submitted on March 22, 2016, and was disapproved on May 19, 2016. The order was delivered to the PUC on July 2, 2016.

. The trial court’s order overruling West Penn’s preliminary objection is interlocutory and, as such, not appealable as of right. However, the trial court certified its order as one that "involves a controlling question of law as to which there is substantial ground for difference of opinion[.]” 42 Pa. C.S. § 702(b). See also Pa. R.A.P. § 1311(a) (stating "[a]n appeal may be taken by permission under 42 Pa. C.S. § 702(b) (interlocutory appeals by permission) from any interlocutory order of a lower court or other governmental unit.”).

. This Court's review of a trial court’s order overruling preliminary objections to a complaint determines whether the trial court erred as a matter of law. Pettko v. Pennsylvania American Water Co., 39 A.3d 473, 477 n.7 (Pa. Cmwlth. 2012). Because it involves a pure question of law, our standard of review is de novo and our scope of review is plenary. Thierfelder v. Wolfert, 617 Pa. 295, 52 A.3d 1251, 1261 (2012).

. This Court has explained that the "purpose of the Alternative Energy Act is to encourage growth and investment in renewable sources of energy.” Dauphin County Industrial Development Authority v. Pennsylvania Public Utility Commission, 123 A.3d 1124, 1131 (Pa. Cmwlth. 2015), appeal denied, 140 A.3d 14 (Pa. 2016).

. Section 3(e)(2) of the Alternative Energy Act states that the PUC will approve an independent entity to serve as "alternative energy credits program administrator,” with the "powers and duties assigned by [PUC] regulations.” 73 P.S. § 1648.3(e)(2).

.The legislature did not specify that these "rules” were to be produced in the form of a regulation, as it did specify for the alternative energy credits program, at least indirectly. 73 P.S. § '1648.3(e)(2).

, See n.3, 4, supra, for definitions of an electric distribution company and electric generation supplier,

. The PUC’s proposal to amend this regulation will require the customer-generator to use electricity for "a purpose other than to support the organization, maintenance or administration of the alternative energy.” See 44 Pa. B. 4182 (2014). The amendment does not specify the minimum amount that must .be used for this other purpose.
Sunrise,Energy consumes, a relatively small amount of electricity compared to the amount *902 it generates. See Amended Complaint, Ex. 4; R.R. 38a. West Penn argues that Sunrise Energy is consuming electricity only for maintaining and administering the net-metering system. West Penn Brief at 30. However, this factual averment does not appear in the Amended Complaint. In considering West Penn's preliminary objections, we are bound by the facts as pled.

. Should West Penn prevail on the statutory construction issue, this may make the Electric Service Agreement void or voidable. This would leave Sunrise Energy's quasi-contract claims and promissory estoppel claims for disposition.

. A utility tariff has been defined by this Court as follows:
A tariff is a set'of operating rules imposed by the State that a public utility must follow if it wishes to provide services to customers. It is a public document which sets forth the schedule of rates and services and rules, regulations and practices regarding those services. '
PPL Electric Utilities Corporation v. Pennsylvania Public Utility Commission, 912 A.2d 386, 402 (Pa. Cmwlth. 2006) (emphasis added). , ,

. It states, in relevant part, as follows:
Hearing and suspension of rate change.— Whenever there is filed with the [PUC] by any public utility any tariff stating a new rate, the [PUC] may, either upon complaint or upon its own 'motion, upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate, and pending such hearing and the decision thereon, the [PUC], upon filing with such tariff and delivering to the public utility affected thereby a statement in writing of its reasons therefor, may, at any time before it becomes effective, suspend the operation of such rate for a period not longer than six months from the time such rate would otherwise become effective, and an additional period of not more than three months pending such decision. The rate in force when the tariff stating the new rate was filed shall continue in force during the period of suspension, unless the [PUC] shall establish a temporary rate as authorized in section 1310 (relating to temporary rates).
66 Pa. C.S. § 1308(b) (emphasis added). Section 1308(b) of the Public Utility Code confers exclusive jurisdiction in the PUC to conduct hearings on a utility’s new rate upon the filing of a complaint by a customer of the utility. There is no analog to Section 1308(b) in the Alternative Energy Act, which is silent on where, or how, a person claiming a violation of the Alternative Energy Act should proceed.

. The Electric Service Agreement also states in relevant part:
[West Penn] and [Sunrise Energy] mutually agree, with the intent to be legally bound, as follows:
1. [West Penn’s] tariff rules and regulations ("Rules and Regulations”) as they now exist, or may be amended from time to time, are incorporated into and made part of this Agreement. The Rules and Regulations are in addition to and supplement this Agreement. Therefore, they shall be interpreted and read to be consistent with the paragraphs of this Agreement.
R.R. 27a.

. The legislature has established the amount the utility must pay to compensate customer-generators for their excess electricity. Although the PUC requires the utility to file a net energy metering rider with the PUC, this filing requirement is redundant of the statute and unnecessary.

. As noted, the PUC has a duty to set “technical interconnection rules,” but the legislature did not specify that these "rules” be established by a regulation as it did with respect to the alternative energy credits program. Compare Section 3(e)(2) and Section 5 of the Alternative Energy Act, 73 P.S. §§ 1648.3(e)(2), 1648.5.
The PUC’s existing regulation defines "customer-generator” in language that is identical to that used by the legislature in the Alternative-Energy Act. Compare 52 Pa. Code § 75.1 and Section 2 of the Alternative Energy Act, 73 P.S. § 1648.2. The PUC's proposed amendment will add the words "retail electric customer” to the regulation’s definition of "customer-generator.” 44 Pa. B. 4179 (2014), Annex A, The PUC describes generators without a sufficient retail load as "merchant generators," which is a term that does not appear in the Alternative Energy Act.

. In ARIPPA v. Pennsylvania Public Utility Commission, 966 A.2d 1204, 1207 (Pa. Cmwlth. 2009); two electric distribution companies requested a declaratory order from the PUC that "the electric distribution company owned the alternative energy credits,” The intervenor, ARIPPA, appealed the PUC's adjudication asserting, inter alia, that the PUC lacked subject matter jurisdiction. This Court rejected this argument, noting, inter alia, that ARIPPA did not raise this argument until its appeal to this Court. This Court also held that the question at issue in ARIPPA dealt with the ownership and transfer of energy credits as set forth in the PUC’s regulation. It required construction of the PUC’s regulation on energy credits, not a construction of the Alternative Energy Act. The instant case has nothing to do with the PUC’s alternative energy credit program. Likewise, the PUC’s technical interconnection rules for customer-generators are not relevant to West Penn’s defense.

. In Elkin, after conducting an evidentiary hearing, the PUC dismissed Elkin’s complaint that Bell Telephone had failed to furnish “reasonable, rapid and efficient service.” 420 A.2d at 373. Elkin did not appeal this adjudication but filed a tort claim in common pleas court. Bell Telephone argued that Elkin’s tort claim constituted a collateral attack on the PUC’s adjudication, and the Supreme Court agreed. Nevertheless, our Supreme Court reiterated that administrative expertise is "no talisman dissolving a court's jurisdiction.” Id. at 376. Elkin is inapposite to this case'. Elkin arose under the Public Utility Code,- and it concerned adequacy of utility service, which, as acknowledged here by the trial court, is a subject matter committed to the PUC.‘