IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David N. Hommrich, :
:
Petitioner :
:
v. : No. 674 M.D. 2016
: Submitted: August 2, 2019
Commonwealth of Pennsylvania, :
Pennsylvania Public Utilities :
Commission, :
:
Respondent :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION
BY JUDGE WOJCIK                         FILED:  May 12, 2020


Before this Court for disposition, in our original jurisdiction, are the parties' cross Applications for Summary Relief to Petitioner David N. Hommrich's (Hommrich) "Amended Petition for Review in the Nature of a Complaint for Declaratory and Injunctive Relief" (Amended Petition) under the Declaratory Judgments Act (DJA).[1]   Specifically, Hommrich seeks a declaration that Respondent Pennsylvania Public Utility Commission's (PUC)[2] regulations on alternative energy projects are invalid and unenforceable.  In turn, the PUC seeks

_____

[1] 42 Pa. C.S. §§7531-7541.

[2] We note that the proper designation for the PUC is the "Public Utility Commission," not "Utilities" as designated by Hommrich in the pleadings and caption.  *See* 66 Pa. C.S. §301.

the dismissal of Hommrich's Amended Petition because the regulations are valid and enforceable or, alternatively, an evidentiary hearing. For the reasons that follow, we grant in part and deny in part the parties' cross Applications for Summary Relief.

## I. Background

In January 2017, Hommrich filed his Amended Petition challenging the PUC's regulations[3] pertaining to net metering as unauthorized under the Alternative Energy Portfolio Standards Act (AEPS Act),[4] and seeking a declaration of invalidity in addition to other relief. The PUC responded by filing preliminary objections, which this Court sustained in part and overruled in part, thereby leaving only the issue of whether the challenged regulatory provisions are invalid and unenforceable under the AEPS Act. *See Hommrich v. Pennsylvania Public Utilities Commission* (Pa. Cmwlth., No. 674 M.D. 2016, filed July 28, 2017).[5] The PUC then filed an Answer and New Matter to the Amended Petition, to which Hommrich responded. Thereafter, the parties filed the cross Applications for Summary Relief now before us.

---

[3] The regulations were adopted on December 15, 2006, and appear in Title 52 of Chapter 75 of the Pennsylvania Code, 52 Pa. Code §§75.1-75.72. Those pertaining to net metering are set forth in subchapters A and B, 52 Pa. Code §§75.1-75.17, which were amended on November 19, 2016.

[4] Act of November 30, 2004, P.L. 1672, *as amended*, 73 P.S. §§1648.1-1648.8.

[5] In *Hommrich*, the procedural history of this case as well as the facts alleged in the Amended Petition are set forth in detail.

2

## II. Issues

Hommrich asserts that the PUC does not have statutory authority to promulgate certain regulations establishing eligibility criteria for net metering. Even if it did, Hommrich contends that the regulations run afoul of the AEPS Act and this Court's holding in *Sunrise Energy, LLC v. FirstEnergy Corp.*, 148 A.3d 894, 901 (Pa. Cmwlth. 2016), *appeal denied*, 169 A.3d 1025 (Pa. 2017). Specifically, Hommrich challenges the following regulations:

52 Pa. Code §75.1 – Definitions of "customer-generator" and "utility"

52 Pa. Code §75.12 – "Virtual meter aggregation"

52 Pa. Code §75.13(a)(1)

52 Pa. Code §75.13(a)(5)

52 Pa. Code §75.16 – Large customer-generators

52 Pa. Code §75.17

Hommrich maintains that there are no issues of material fact that would serve to preclude this Court from determining that these regulations are invalid, even when viewing the evidence in a light most favorable to the PUC. For these reasons, Hommrich asks this Court to declare the challenged regulations as invalid and unenforceable.

The PUC counters that Hommrich has failed to prove on the pleadings that the PUC lacked authority to promulgate the challenged regulations or that the challenged regulations are unreasonable. The PUC's authority derives from the AEPS Act as well as the Public Utility Code (Code).[6] The PUC argues that its

---

[6] 66 Pa. C.S. §§101-3316.

3

regulations reflect a reasonable interpretation of the AEPS Act and that it is entitled to great deference as the administrative agency with expertise on the subject. Accordingly, the PUC asks this Court to dismiss Hommrich's Amended Petition or, in the alternative, hold an evidentiary hearing to establish material facts.

### III. Discussion
### A. Legal Standards
### 1. Summary Relief

Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure provides that "the court may on application enter judgment if the right of the applicant thereto is clear." Pa. R.A.P. 1532(b); *see Scarnati v. Wolf*, 173 A.3d 1110, 1118 (Pa. 2017) ("The standard for granting summary relief turns upon whether the applicant's right to relief is clear. Summary relief on a petition for review is similar to the relief provided by a grant of summary judgment. Pa. R.A.P. 1532, Official Note.") (footnote omitted). "Summary judgment is appropriate where, after the close of pleadings, 'there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report.'" *Scarnati*, 173 A.3d at 1118 (quoting Pa. R.C.P. No. 1035.2(a)). Conversely, "[w]here there are material issues of fact in dispute or if it is not clear that the applicant is entitled to judgment as a matter of law, the application will be denied." *Sherman v. Kaiser*, 664 A.2d 221, 225 (Pa. Cmwlth. 1995). "A fact is considered material if its resolution could affect the outcome of the case under the governing law." *Hospital & Healthsystem Association of Pennsylvania v. Commonwealth*, 77 A.3d 587, 602 (Pa. 2013).

Hommrich maintains that there are no genuine issues of material fact in dispute and that this matter is ripe for summary relief. However, in its alternative request for relief, the PUC suggests that an evidentiary hearing may be necessary to establish material facts. The dispute centers over whether the PUC has the authority to enact the challenged regulations and whether those regulations contradict the AEPS Act. Such issues may be resolved based on comparison of statutory and regulatory provisions as a matter of law. *See Marcellus Shale Coalition v. Department of Environmental Protection*, 193 A.3d 447, 460 (Pa. Cmwlth.), *appeal quashed*, 198 A.3d 330 (Pa. 2018). Thus, we conclude that the parties' cross Applications for Summary Relief seeking a determination as to whether the regulations are unlawful and unenforceable are ripe for disposition without an evidentiary hearing.

## 2. DJA

Section 7533 of the DJA states:

> Any person interested under a deed, will, written contract, or other writings constituting a contract, *or whose rights, status, or other legal relations are affected by a statute*, municipal ordinance, contract, or franchise, *may have determined any question of construction or validity arising under the* instrument, *statute*, ordinance, contract, or franchise, and obtain a declaration of rights, status, or other legal relations thereunder.

42 Pa. C.S. §7533 (emphasis added). The DJA was enacted "to curb the courts' tendency to limit the availability of judicial relief to only cases where an actual wrong has been done or is imminent." *Bayada Nurses, Inc. v. Department of Labor and Industry*, 8 A.3d 866, 874 (Pa. 2010). The purpose of the DJA is "to

5

settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations" and, accordingly, the DJA should "be liberally construed and administered." 42 Pa. C.S. §7541(a); *accord Office of Governor v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014) (citation omitted); *Funk v. Wolf*, 144 A.3d 228, 251 (Pa. Cmwlth. 2016), *aff'd*, 158 A.3d 642 (Pa. 2017). As we previously determined in *Hommrich*, "[a] DJA action is the appropriate means to settle and afford relief from uncertainty and insecurity with respect to the regulations and [Hommrich's] putative status as a customer generator." Slip op. at 16.

### B. AEPS Act and Regulations

In 2004, the Pennsylvania legislature recognized the need for environmentally cleaner alternatives to fossil fuel energy production, and as a result, it passed the AEPS Act. The AEPS Act incentivizes alternative energy producers to generate their own energy utilizing one of the approved alternative energy production methods, such as wind and solar power, and sell any excess energy not used to the Electric Distribution Companies (EDCs). Section 2 of the AEPS Act, 73 P.S. §1648.2. Section 5 of the AEPS Act requires EDCs to purchase any net energy produced by these alternative energy providers at the full retail value. Section 5 of the AEPS Act, 73 P.S. §1648.5. Colloquially speaking, this provision allows the meter to run backwards. Of particular import here, Section 5 of the AEPS Act further provides:

> *The [PUC] shall develop technical and net metering interconnection rules for customer-generators intending to operate renewable onsite generators in parallel with the electric utility grid, consistent with rules defined in other states within the service region of the regional*

> *transmission organization [(RTO)] that manages the transmission system in any part of this Commonwealth. The [PUC] shall convene a stakeholder process to develop Statewide technical and net metering rules for customer-generators. The [PUC] shall develop these rules within nine months of the effective date of this act.*

73 P.S. §1648.5 (emphasis added). Pursuant to this legislative rule-making authority, the PUC adopted the regulations establishing technical and net metering interconnection rules for customer-generators that are subject to this litigation.

### 1. Legislative Rule-Making

The Supreme Court of Pennsylvania "has long recognized the distinction in administrative agency law between the authority of a rule adopted pursuant to an agency's legislative rule-making power and the authority of a rule adopted pursuant to interpretive rule-making power." *Popowsky v. Pennsylvania Public Utility Commissio*n, 910 A.2d 38, 53 (Pa. 2006) (citations omitted). "Legislative rule-making is an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the legislative body, and is valid and is as binding upon a court as a statute if it is: (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable." *Id.*; *accord Tire Jockey Service, Inc. v. Department of Environmental Protection*, 915 A.2d 1165, 1186 (Pa. 2007). "Generally, a legislative regulation establishes 'a substantive rule creating a controlling standard of conduct.'" *Borough of Pottstown v. Pennsylvania Municipal Retirement Board*, 712 A.2d 741, 743 (Pa. 1998) (quoting *Slippery Rock Area School District v. Unemployment Compensation Board of Review*, 983 A.2d 1231, 1236 (Pa. 2009)).

"An interpretative rule on the other hand depends for its validity not upon a Law-making grant of power, but rather upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute it interprets." *Popowsky*, 910 A.2d at 53. Legislative regulations are binding whereas interpretative regulations are merely entitled to deference. *Slippery Rock*, 983 A.2d at 1236. All regulations, whether legislative or interpretative, "must be consistent with the statute under which they were promulgated." *Popowsky*, 910 A.2d at 53.

Here, Section 5 of the AEPS Act constitutes a legislative grant of power. Consequently, we engage in a legislative rule-making analysis to determine the validity of the challenged regulations. *See Tire Jockey*; *Popowsky*. Although the parties agree that the challenged regulations were adopted following the appropriate procedures, they disagree regarding the other prongs of the validity test. Therefore, our focus is on whether the challenged regulations fall within the PUC's granted power and are reasonable. *Tire Jockey*; *Popowsky*.

### a. PUC's Granted Power

"To determine whether a regulation is adopted within an agency's granted power, we look for statutory language authorizing the agency to promulgate the legislative rule and examine that language to determine whether the rule falls within the grant of authority." *Marcellus Shale Coalition v. Department of Environmental Protection*, 216 A.3d 448, 459 (Pa. Cmwlth.), *appeals quashed*, 223 A.3d 655 (Pa. 2019) (citing *Slippery Rock*, 983 A.2d at 1239-41). We consider "the purpose of the statute and its reasonable effect" and whether "the regulation is consistent with the enabling statute." *Id.* "Clearly[,] the legislature

8

would not authorize agencies to adopt binding regulations inconsistent with the applicable enabling statutes." *Slippery Rock*, 983 A.2d at 1241. "When . . . a regulation presents 'an actual conflict with the statute,' we cannot reasonably understand the regulation to be within the agency's ambit of authority, and the statute must prevail." *Marcellus Shale*, 216 A.3d at 459 (quoting *AMP Inc. v. Commonwealth,* 814 A.2d 782, 786 (Pa. Cmwlth. 2002), *aff'd*, 852 A.2d 1161 (Pa. 2004)). Indeed, "a regulation that is at variance with a statute is ineffective to change the statute's meaning." *Geisinger Health System v. Bureau of Workers' Compensation Fee Review Hearing Office (SWIF)*, 138 A.3d 133, 139 (Pa. Cmwlth. 2016). "That is so because 'the power of an administrative agency to prescribe rules and regulations under a statute is not the power to make law, but only the power to adopt regulations to carry into effect the will of the Legislature as expressed by the statute.'" *Id.* (quoting *Volunteer Firemen's Relief Association of the City of Reading v. Minehart*, 227 A.2d 632, 635-36 (Pa. 1967)). "When an agency adopts regulations at variance with the statute, the regulations, and not the statute, fall by the wayside." *Id.* (citing *Union Electric Corporation v. Board of Property Assessment, Appeals and Review of Allegheny County*, 721 A.2d 823 (Pa. Cmwlth. 1998), *rev'd on other grounds*, 746 A.2d 581 (Pa. 2000)).

Sometimes, the General Assembly confers broad power. For example, in Section 201(a) of the Unemployment Compensation Law,[7] the General Assembly vested power in the Department of Labor and Industry (L&I) "to adopt, amend, and rescind such rules and regulations . . . as it deems necessary or suitable. Such rules and regulations shall not be inconsistent with the provisions of

---

[7] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §761(a).

this act." In *Slippery Rock*, our Supreme Court described this power as "broad" and one that encompassed L&I's authority "to define by regulation terms otherwise undefined by the statute." *Slippery Rock*, 983 A.2d 1239. In *Pennsylvania Human Relations Commission v. Uniontown Area School District*, 313 A.2d 156, 168-71 (Pa. 1973), the Supreme Court held that similar statutory language in Section 7(d) of the Pennsylvania Human Relations Act[8] allowed the PHRC to promulgate a regulation that defined "*de facto* segregation" in such a way that it imposed strict desegregation standards and new accompanying duties on public schools. In other chapters relating to alternative energy, the General Assembly has yielded similar broad authority to other agencies. *See, e.g.*, Section 7 of Alternative Fuels Incentive Act[9] ("The [Department of Environmental Protection (DEP)] shall promulgate regulations necessary to carry out the purposes of this act."); Section 607 of Alternative Energy Investment Act[10] ("The [Pennsylvania Housing Finance Agency] shall promulgate guidelines necessary for the administration and enforcement of this act.").

In contrast, the powers the General Assembly conferred to the PUC under the AEPS Act are much narrower. *Sunrise Energy,* 148 A.3d at 901. Section 5 of the AEPS Act authorizes the PUC to "develop technical and net metering interconnection rules for customer-generators intending to operate

---

[8] Act of October 27, 1955, P.L., *as amended*, 43 P.S. §957(d) (authorizing the Pennsylvania Human Relations Commission (PHRC) "[t]o adopt, promulgate, amend and rescind rules and regulations to effectuate the policies and provisions of this act").

[9] Act of November 29, 2004, P.L. 1376, 73 P.S. §1647.7.

[10] Act of July 9, 2008, P.L. 1873 (Spec. Sess. No. 1), 73 P.S. §1649.607.

renewable onsite generators in parallel with the electric utility grid . . . ." 73 P.S. §1648.5. What is missing is the broad grant of authority to do whatever is necessary to effectuate the enabling statute.[11] *See id.*

In *Sunrise Energy*, this Court examined the PUC's regulatory authority under the AEPS Act in addressing a jurisdictional issue. There, the PUC[12] argued that it had primary jurisdiction over a contract dispute between a customer-generator and an EDC regarding their net metering arrangement under the AEPS Act. We examined the AEPS Act to determine whether it conferred any authority on the PUC to resolve such disputes and, ultimately, we determined it did not. *Sunrise Energy*, 148 A.3d at 901. We opined that the PUC's authority under the AEPS Act is "narrow" in scope and, essentially, is limited to establishing "technical and net metering interconnection rules." *Id.* The Act "does not give the PUC power to act beyond this narrow authorization." *Id.* (emphasis added) (citing Section 5 of the AEPS Act, 73 P.S. §1648.5).

The PUC argues that reliance on *Sunrise Energy* is misplaced because this Court merely held that the PUC lacked exclusive adjudicatory authority over certain issues arising under the AEPS Act pursuant to the judicial doctrine of

---

[11] We also note that the General Assembly did not delegate exclusive authority under the AEPS Act to the PUC, but rather authorized interagency responsibility with regard to environmental and health and safety standards. Specifically, Section 7(b) of the AEPS Act, discussed *infra*, confers upon the DEP the power to "ensure that all qualified alternative energy sources meet all applicable environmental standards and shall verify that an alternative energy source meets the standards set forth in section 2," which is where the AEPS Act defines, *inter alia*, "alternative energy sources." 73 P.S. §1648.7(b). Section 6 of the AEPS Act directs the PUC to cooperate with L&I to develop health and safety standards, as needed, regarding facilities generating energy from alternative energy sources. Section 6 of the AEPS Act, 73 P.S. §1648.6.

[12] In *Sunrise Energy*, the PUC filed an amicus curiae brief.

11

primary jurisdiction. We did not address the PUC's legislative rule-making authority, much less hold that the PUC lacked legislative rule-making authority to promulgate net metering regulations. Although our specific focus was on jurisdiction, our broader focus was on the PUC's authority under the AEPS Act, which is the issue at hand. Therefore, our determination that the PUC's authority under the AEPS Act is limited to establishing "technical and net metering interconnection rules" is equally applicable.

Nevertheless, the PUC maintains that its authority to promulgate the challenged net metering regulations is not solely under the AEPS Act. Rather, the PUC maintains that it has the authority to promulgate the regulations implementing the AEPS Act under its general legislative rule-making authority to regulate public utilities and the services they provide, including the service of interconnection and net metering of onsite generation. Specifically, the PUC posits that its authority to regulate public utilities derives from Sections 501, 508, 1501, 1504 and 2807(e) of the Code, 66 Pa. C.S. §§501, 508, 1501, 1504 and 2807(e).

Section 501 of the Code sets forth the general powers delegated to the PUC. 66 Pa. C.S. §501. Pursuant thereto, the PUC is authorized to "enforce, execute and carry out, by its regulations, orders, or otherwise, all and singular, the provisions of [the Code] . . . ." 66 Pa. C.S. §501(a). Further, the PUC:

> shall have general administrative power and authority to supervise and regulate all public utilities doing business within this Commonwealth. The [PUC] may make such regulations, not inconsistent with law, as may be necessary or proper in the exercise of its powers or for the performance of its duties.

66 Pa. C.S. §501(b). Section 508 of the Code authorizes the PUC to vary, reform and revise contracts entered into between any public utility and any person,

12

corporation or municipal corporation. 66 Pa. C.S. §508. Section 1501 gives the PUC the "sole and exclusive jurisdiction to promulgate rules and regulations for the allocation of natural or artificial gas supply by a public utility." 66 Pa. C.S. §1501. Section 1504 of the Code allows the PUC to prescribe regulations and rules governing standards of service and facilities of public utilities. 66 Pa. C.S. §1504. Section 2807 of the Code authorizes the PUC to establish regulations governing EDCs. 66 Pa. Code §2807.

Further, the PUC maintains that it has the authority to enact and enforce its regulations pursuant to Sections 501 (general powers), 502 (pertaining to enforcement proceedings by the PUC), 701 (pertaining to complaints regarding, *inter alia*, any violation of any law or "of any regulation or order of the [PUC]") and 3301(a) (pertaining to civil penalties for, *inter alia*, any failure to "comply with any regulation or final direction, requirement, determination or order made by the [PUC] . . . "). 66 Pa. C.S. §§501, 502, 701, and 3301(a).

We recognize the PUC's broad authority in regulating public utilities under the Code. As this Court recently opined, "the General Assembly intended the PUC to occupy the field of public utility regulation, in the absence of an express grant of authority to the contrary." *Delaware Riverkeeper Network v. Sunoco Pipeline L.P.*, 179 A.3d 670, 692 (Pa. Cmwlth.), *appeal denied*, 192 A.3d 1106 (Pa. 2018). However, we are not dealing with "public utilities" here. *See* 66 Pa. C.S. §102 (definition of "public utility"). Rather, the AEPS Act applies to "customer-generators," which by definition are not public utilities. *See* Section 2 of the AEPS Act, 73 P.S. §1648.2. We, therefore, conclude that the PUC's authority in this matter derives solely from the AEPS Act, and not the Code.

13

Under the AEPS Act, the PUC's authority is limited to developing "technical and net metering interconnection rules." Section 5 of the AEPS Act, 73 P.S. §1648.5.

### b. Reasonable

In deciding whether a legislative regulation is reasonable:

> The court may not substitute its own judgment for that of the agency. To demonstrate that the agency has exceeded its administrative authority, it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or lack of wisdom in exercising agency power is not equivalent to abuse. What has been ordered must appear to be so entirely at odds with fundamental principles as to be the expression of a whim rather than an exercise of judgment.

*Tire Jockey*, 915 A.2d at 1186 (internal quotations and citations omitted); *accord Slippery Rock*, 983 A.2d at 1242. "[A]ppellate courts must accord deference to the agency and may only overturn an agency determination if the agency acted in bad faith or the regulations constituted a manifest or flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions." *Popowsky*, 910 A.2d at 55; *accord Tire Jockey*, 915 A.2d at 1186. However, when there is express, contradictory language in the statute conferring regulatory authority, a proposed regulation would be deemed "unreasonable." *See Keith v. Commonwealth*, 151 A.3d 687, 695 (Pa. Cmwlth. 2016). Nevertheless, "where legislative rules are adopted within the agency's granted power and issued pursuant to proper procedure, they enjoy a presumption of reasonableness." *Marcellus Shale*, 216 A.3d at 460. With these principles in mind, we examine each of the challenged regulations to determine whether the PUC acted within the scope of its

14

delegated authority under the AEPS Act and, if so, whether the regulations are reasonable.

## 2. Challenged Regulations

### a. 52 Pa. Code §75.1 – Definitions of "Customer-Generator" & "Utility"

Section 2 of the AEPS Act defines "customer-generator" as:

> A nonutility owner or operator of a net metered distributed generation system with a nameplate capacity of not greater than 50 kilowatts[13] if installed at a residential service or not larger than 3,000 kilowatts at other customer service locations, except for customers whose systems are above three megawatts[14] and up to five megawatts who make their systems available to operate in parallel with the electric utility during grid emergencies as defined by the [RTO] or where a microgrid is in place for the primary or secondary purpose of maintaining critical infrastructure, such as homeland security assignments, emergency services facilities, hospitals, traffic signals, wastewater treatment plants or telecommunications facilities, provided that technical rules for operating generators interconnected with facilities of an electric distribution company, electric cooperative or municipal electric system have been promulgated by the Institute of Electrical and Electronic Engineers [(IEEE)]] and the [PUC].

73 P.S. §1648.2.

Section 2 of the AEPS Act defines "net metering" as:

> The means of measuring the difference between the electricity supplied by an electric utility and the electricity generated by a customer-generator when any

---

[13] A kilowatt or "kW" is "[a] unit of power representing 1,000 watts. A kW equals 1/1000 of a MW." 52 Pa. Code §75.1.

[14] A megawatt or "MW" is "[a] unit of power representing 1,000,000 watts. An MW equals 1,000 kWs." 52 Pa. Code §75.1.

portion of the electricity generated by the alternative energy generating system *is used to offset part or all of the customer-generator's requirements for electricity.* Virtual meter aggregation on properties owned or leased and operated by a customer-generator and located within two miles of the boundaries of the customer-generator's property and within a single electric distribution company's service territory shall be eligible for net metering.

73 P.S. §1648.2 (emphasis added). Thus, a nonutility owner or operator of a net-metered facility may utilize net metering so long as "any portion" of the electricity that the customer-generator generates is used to offset part of the customer-generator's electrical requirement. *Id.* The General Assembly directed the PUC to establish "rules *for* customer-generators." 73 P.S. §1648.5 (emphasis added).

Under the regulations, the PUC provides its own definition of "customer-generator":

> *A retail electric customer that is a* nonutility owner or operator of a net metered distributed generation system with a nameplate capacity of not greater than 50 kilowatts if installed at a residential service or not larger than 3,000 kilowatts at other customer service locations, except for customers whose systems are above 3 megawatts and up to 5 megawatts who make their systems available to operate in parallel with the electric utility during grid emergencies as defined by the [RTO] or where a microgrid is in place for the primary or secondary purpose of maintaining critical infrastructure, such as homeland security assignments, emergency services facilities, hospitals, traffic signals, wastewater treatment plants or telecommunications facilities, provided that technical rules for operating generators interconnected with facilities of an EDC, electric cooperative or municipal electric system have been promulgated by the [IEEE] and the [PUC].

16

52 Pa. Code §75.1 (emphasis added).  When compared to the statutory definition, the definitions are virtually identical but for the PUC's addition of "*a retail electric customer that is*" to qualify nonutility owner or operator.

Moreover, the AEPS Act does not define "utility."  The PUC defines "utility" as:

> (i) A business, person or entity whose primary purpose, character or nature is the generation, transmission, distribution or sale of electricity at wholesale or retail.
>
> (ii) The term excludes building or facility owners or operators that manage the internal distribution system serving the building or facility and that supply electric power and other related power services to occupants of the building or facility.

52 Pa. Code §75.1.

In short, the PUC's regulation alters the AEPS Act's requirement that a customer-generator simply be a "nonutility owner or operator" of a net metering facility by adding the requirement that the customer-generator must be "*a retail electric customer* that is a nonutility owner or operator" of a net metering facility. 52 Pa. Code §75.1.  The PUC then defined the term "utility," which is not defined in the AEPS Act, to include any business whose purpose is the "generation, transmission, distribution or sale of electricity at wholesale or retail."  *Id.* According to the PUC, to qualify as a "customer-generator," the entity must have a need for electricity from the EDC independent from its need for electricity needed to power its generation facilities.  *See* 52 Pa. Code §75.12.  The PUC claims that had the General Assembly intended to permit generation facilities to qualify for net metering benefits regardless of their electric need at the generation site, it would

17

not have used the term "customer-generator" to identify the entities that qualify for net metering under the AEPS Act.

By the same token, the General Assembly did not add such restrictions to its statutory definition of "customer-generator." In fact, the General Assembly took steps to broaden, not restrict, the pool of alternative energy sources with the 2007 amendments. When the General Assembly amended the definition of customer-generator in 2007, it increased the kilowatt capacity from 1,000 to 3,000 kilowatts and the amount of system megawatts from one to two megawatts to three to five megawatts. *Compare* 73 P.S. §1648.2 *with former* Section 2 of the AEPS Act, *formerly* 73 P.S. §1648.2 (2007). Prior to the 2007 amendments, the definition of "net metering" measured "the electricity generated by a customer-generator when the *renewable* electricity generated by the alternative energy generating system is *intended primarily* to offset part or all of the customer-generator's requirements for electricity." *Former* 73 P.S. §1648.2 (2007) (emphasis added). Under the current definition, a nonutility owner or operator of a net-metered facility may utilize net metering so long as "*any portion*" of the electricity that the customer-generator generates is used to offset part of the customer-generator's electrical requirement. 73 P.S. §1648.2 (emphasis added).

Moreover, the PUC's restrictions run contrary to the purpose of the AEPS Act. The purpose of the AEPS Act is to encourage the development of energy generated from renewable and environmentally beneficial sources. *See* Historical and Statutory Notes to AEPS Act. Even the PUC recognizes that the "unquestioned purpose of the AEPS Act is to promote alternative energy generation." Respondent's Brief at 9. However, the PUC's definitions restrict the field of qualifying participants and, in the process, curtail the development of

18

alternative renewable energy in the Commonwealth. *Id.* To illustrate, under the AEPS Act, Hommrich qualifies as a customer-generator; under the regulations, he does not.

The General Assembly authorized the PUC to establish "rules *for* customer-generators," a term defined by statute. 73 P.S. §1648.5 (emphasis added). The General Assembly did not task the PUC with redefining or restricting eligibility standards as established in the AEPS Act. The challenged definitions do just that. The regulatory definitions modify the express statutory language by adding new criteria and requirements that limit the ability of certain customer-generators to net meter excess generation of energy. In so doing, the PUC is legislating who can and cannot utilize net metering by providing greater restrictions than the legislature prescribed and has acted beyond its legislative rule-making power.

Although the PUC argues that its regulations reflect a reasonable interpretation of the AEPS Act and that it should be accorded great deference as the administrative agency with expertise on the subject, the PUC cannot alter the AEPS Act. By redefining these terms and adding requirements that the legislature did not see fit to include, the PUC has stepped beyond its appropriate legislative mandate and into the realm of making law. Such changes amount to policy decisions that require legislative review. For these reasons, we conclude that the PUC's regulatory definitions of "customer-generator" and "utility" are unenforceable because they redefine statutory eligibility standards and curtail the development of alternative energy in conflict with the AEPS Act.

19

**b. 52 Pa. Code §75.12 - "Virtual Meter Aggregation"**

Next, the PUC's regulations define "Virtual meter aggregation" as:

The combination of readings and billing for all meters regardless of rate class on properties owned or leased and operated by a customer-generator by means of the EDC's billing process, rather than through physical rewiring of the customer-generator's property for a physical, single point of contact. Virtual meter aggregation on properties owned or leased and operated by the same customer-generator and located within 2 miles of the boundaries of the customer-generator's property and within a single EDC's service territory shall be eligible for net metering. Service locations to be aggregated must be EDC service location accounts, held by the same individual or legal entity, receiving retail electric service from the same EDC and *have measureable electric load independent of the alternative energy system. To be independent of the alternative energy system, the electric load must have a purpose other than to support the operation, maintenance or administration of the alternative energy system*.

52 Pa. Code §75.12 (emphasis added).

As defined in the AEPS Act, the definition of "net metering" merely requires that "*any portion* of the electricity generated by the alternative energy generating system is used to offset part or all of the customer-generator's requirements for electricity . . . ." 73 P.S. §1648.2 (emphasis added). As part of that definition, the AEPS Act provides: "Virtual meter aggregation on properties owned or leased and operated by a customer-generator and located within two miles of the boundaries of the customer-generator's property and within a single electric distribution company's service territory *shall be eligible for net metering*." *Id.*

The PUC's definition of "virtual meter aggregation" adds a new component that the customer-generator must have a "measurable electric load independent" of the customer-generator's system. 52 Pa. Code §75.12. For there to be independent load, the electric load must "have a purpose other than to support" the customer-generator's alternative energy system. *Id.* These requirements concerning independent load are found nowhere in the AEPS Act. Although we recognize the PUC's concerns regarding unrestricted net metering, such eligibility restrictions are matters for the General Assembly, not the PUC, to legislate. Therefore, this regulation is unenforceable because it is beyond the PUC's authority.

### c. 52 Pa. Code §75.13(a)(1)

Next, the PUC's regulations provide:

(a) EDCs and [default service providers (DSPs)] shall offer net metering to customer-generators that generate electricity on the customer-generator's side of the meter using Tier I or Tier II alternative energy sources, on a first come, first served basis. To qualify for net metering, the customer-generator shall meet the following conditions:

(1) *Have electric load, independent of the alternative energy system, behind the meter and point of interconnection of the alternative energy system. To be independent of the alternative energy system, the electric load must have a purpose other than to support the operation, maintenance or administration of the alternative energy system.*

52 Pa. Code §75.13(a)(1) (emphasis added). Pursuant to the regulation, customer-generators must have an "independent load" in order to net meter. As discussed

21

above, there is no corollary for this eligibility requirement in the AEPS Act. For the same reasons, this regulation is likewise unenforceable.

### d. 52 Pa. Code §§75.13(a)(5) and 75.17

Under the regulations, any application for a proposed net metering facility with a nameplate capacity exceeding 500 kilowatts must be approved by the PUC. 52 Pa. Code §75.13(a)(5). Specifically, Section 75.13(a)(5) of the regulations provides:

> An alternative energy system with a nameplate capacity of 500 kW or more must have [PUC] approval to net meter in accordance with §75.17 . . . .

52 Pa. Code §75.13(a)(5).

In turn, Section 75.17(a) of the regulations establishes the application process for obtaining the PUC's approval of customer-generator status. Specifically, Section 75.17 provides:

> (a) This section establishes the process through which EDCs obtain [PUC] approval to net meter alternative energy systems with a nameplate capacity of 500 kW or greater.
>
> (b) An EDC shall submit a completed net metering application to the [PUC's] Bureau of Technical Utility Services [(Bureau)] with a recommendation on whether the alternative energy system complies with the applicable provisions of this chapter and the EDC's net metering tariff provisions within 20 days of receiving a completed application. The EDC shall serve its recommendation on the applicant.
>
> (c) The net metering applicant has 20 days to submit a response to the EDC's recommendation to reject an application to the [Bureau].

22

(d) The [Bureau] will review the net metering application, the EDC recommendation and applicant response, and make a determination as to whether the alternative energy system complies with this chapter and the EDC's net metering tariff.

(e) The [Bureau] will approve or disapprove the net metering application within 10 days of an EDC's submission recommending approval. If disapproved, the [Bureau] will describe in detail the reasons for disapproval. The [Bureau] will serve its determination on the EDC and the applicant.
(f) The [Bureau] will approve or disapprove the net metering application within 5 days of an applicant's response to an EDC's recommendation to deny approval, but no more than 30 days after an EDC submits an application with a recommendation to deny approval, whichever is earlier. The [Bureau] will serve its determination on the EDC and the applicant.

(g) The applicant and the EDC may appeal the determination of the [Bureau] in accordance with §5.44 (relating to petitions for reconsideration from actions of the staff).

52 Pa. Code §75.17.

Hommrich argues that this regulatory application process runs afoul of the AEPS Act because it gives the PUC the ultimate authority to approve net metering on facilities with a 500 kW capacity or greater. Although the General Assembly did not authorize the PUC to redefine statutory terms and alter eligibility standards, it did task the PUC with the development of "technical and net metering interconnection rules." 73 P.S. §1648.5. The General Assembly authorized the PUC to carry out its responsibilities under the AEPS Act, which encompasses not only the development of but also ensuring the compliance with those rules. *See* Section 7(a) of the AEPS Act, 73 P.S. §1648.7(a). The application process set

23

forth in Sections 75.13(a)(5) and 75.17 of the regulations is a systematic and reasonable way for the PUC to ensure compliance with the AEPS Act and applicable regulations.

Relying on Section 7(b) of the AEPS Act, 73 P.S. §1648.7(b), Hommrich argues that the PUC has no power to ensure compliance because the General Assembly conferred this authority exclusively to the DEP. However, this Section merely provides that "[t]he [DEP] shall ensure that all qualified alternative energy sources meet all applicable environmental standards and shall verify that an alternative energy source meets the standards set forth in [S]ection 2." 73 P.S. §1648.7(b) (emphasis added). First, the AEPS Act and the PUC's regulations are not environmental standards. Second, to be considered an "alternative energy source," the source must meet one of the delineated sources for the production of electricity, including solar photovoltaic, wind power, hydropower, etc., each of which are defined under Section 2 of the AEPS Act, 73 P.S. §1648.2. Section 2 of the AEPS Act expressly names the DEP in the municipal solid waste definition as the entity with the authority to determine compliance with the environmental standards of the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and the Solid Waste Management Act.[15] The DEP's responsibilities under the AEPS Act are limited and specific. Neither "customer-generator" status nor "net metering" is a standard that any "alternative energy source" must meet to be considered an "alternative energy source" under the AEPS Act. *See id.* Although the DEP is vested with the authority to ensure compliance with environmental standards and alternative energy source standards, this authority does not divest the PUC of its authority pertaining to "technical and net metering interconnection rules." We,

---

[15] Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§6018.101 - 6018.1003.

24

therefore, conclude that Sections 75.13(a)(5) and 75.17 of the regulations fall within the PUC's granted power, do not run afoul of the AEPS Act, and were promulgated based upon a reasonable interpretation of it.

### e. 52 Pa. Code §75.16 - Large customer-generators

Finally, Section 2 of the AEPS Act addresses the requirements of a net-metered facility's operation during a grid emergency in the definition of "customer-generator." 73 P.S. §1648.2. Specifically, non-residential customer-generators operating systems above three megawatts and up to five megawatts, must make their system "available to operate in parallel with the electric utility during grid emergencies as defined by the [RTO]" or when a "microgrid is in place for the primary or secondary purpose of maintaining critical infrastructure . . . ." *Id.*

The PUC classifies systems operating with a capacity between three to five megawatts as "large customer-generators." 52 Pa. Code §75.16. The PUC established rules for operation for large customer-generators. 52 Pa. Code §75.16(a). Specifically, the PUC's regulations provide:

> (b) A retail electric customer may qualify its alternative energy system for customer-generator status if it makes its system available to operate in parallel with the grid during grid emergencies by satisfying the following requirements:
>
> (1) The alternative energy system is able to provide the emergency support consistent with the RTO tariff or agreement.
>
> (2) The alternative energy system is able to increase and decrease generation delivered to the distribution system in parallel with the EDC's operation of the distribution system during the grid emergency.

25

(c) A retail electric customer may qualify its alternative energy system located within a microgrid for customer-generator status if it satisfies the following requirements:

(1) The alternative energy system complies with IEEE Standard 1547.4.

(2) The customer documents that the alternative energy system exists for the primary or secondary purpose of maintaining critical infrastructure.

52 Pa. Code §75.16(b), (c).

Under subsection (b), "large customer-generators" must provide support that is consistent with the RTO tariff and the system must be able to increase or decrease generation in parallel with an EDC's operation of the distribution system during a grid emergency. 52 Pa. Code §75.16(b)(1), (2). The RTO's tariff or agreement defines what a grid emergency is in that RTO. The ability to increase or decrease generation is the technical ability to operate in parallel with the electric utility during grid emergencies as required by the AEPS Act.

Hommrich argues that the AEPS Act contains no requirement that a customer-generator's system be designated as an emergency-type support resource by an RTO. Rather, the AEPS Act only requires that the customer-generator's system be "available." Contrary to Hommrich's argument, it is not enough for the system to be "available." The AEPS Act makes it clear that the system must be physically capable of operating "in parallel" during a grid emergency. 73 P.S. §1648.2. The PUC's regulatory provisions provide technical guidance for what is required to "operate in parallel" during a "grid emergency."

Under subsection (c), the PUC requires an alternative energy system to comply with IEEE Standard 1547.4, which is the standard for microgrids, and

that the customer must document that the alternative energy system exists for the primary or secondary purpose of maintaining critical infrastructure. This subsection provides technical criteria that closely aligns with the requirements set forth in the AEPS Act. *See* 73 P.S. §1648.2. Upon review, the large customer-generator provisions set forth in Section 75.16 of the regulations are within the PUC's legislative rule-making authority, consistent with the language in the AEPS Act, and reasonable.

## IV. Conclusion

In sum, the General Assembly authorized the PUC to promulgate "technical and net metering interconnection rules." Section 5 of the AEPS Act, 73 P.S. §1648.5. By redefining and restricting eligibility standards established by the AEPS Act, the PUC has acted beyond its grant of legislative rule-making authority. Therefore, the definitions of "customer-generator" and "utility" as set forth in Section 75.1, and "virtual meter aggregation" as set forth in Section 75.12 and Section 75.13(a)(1) of the PUC's regulations, overreach and contradict the AEPS Act and are therefore beyond the scope of authority and unreasonable. However, Sections 75.13(a)(5), 75.16, and 75.17 of the regulations fall within the grant of legislative rule-making authority and are reasonable. Accordingly, we grant in part and deny in part the parties' cross Applications for Summary Relief consistent with the foregoing opinion.

_____
MICHAEL H. WOJCIK, Judge

27

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David N. Hommrich, : 
 : 
Petitioner : 
 : 
v. : No. 674 M.D. 2016
 : 
Commonwealth of Pennsylvania, : 
Pennsylvania Public Utilities : 
Commission, : 
 : 
Respondent : 

# O R D E R

AND NOW, this 12th day of May, 2020, consistent with the foregoing opinion, the parties' cross Applications for Summary Relief are GRANTED IN PART and DENIED IN PART, and we hereby DECLARE the following regulations invalid and unenforceable: 52 Pa. Code §§75.12 and 75.13(a)(1), and the definitions of "customer-generator" and "utility" contained in 52 Pa. Code §§75.1.

_____
MICHAEL H. WOJCIK, Judge